# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

-------------------------------------------------------------------X
                                                    :
PEARL SEAS CRUISES, LLC,                            :        CIVIL ACTION NO.
                                                    :        3:10-CV-1294 (JBA)
                        Petitioner,                 :
                                                    :
            v.                                      :
                                                    :
IRVING SHIPBUILDING INC.,                           :
                                                    :
                        Respondent.                 :
                                                    :        NOVEMBER 22, 2010
-------------------------------------------------------------------X


# REPLY MEMORANDUM IN SUPPORT OF RESPONDENT'S CROSS-MOTION
# TO DISMISS THE PETITION TO VACATE ARBITRAL AWARD

Ralph W. Johnson, III, Esq.
CT Fed. Bar No. 15277
**HALLORAN & SAGE LLP**
One Goodwin Square
225 Asylum Street
Hartford, CT 06103
Tel.: (860) 522-6103
Fax: (860) 548-0006
Email: Johnsonr@halloran-sage.com

Stanley McDermott III, Esq.
David S. Wenger, Esq.
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, NY 10020
Tel.: (212) 335-4790
Fax: (212) 884-8490
Email: stanley.mcdermott@dlapiper.com
Email: david.wenger@dlapiper.com

*Counsel for Respondent*
*Irving Shipbuilding Inc.*

# TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ................................................................................ 1

    A.    The Petition to Vacate is Not Justiciable ................................................ 1

    B.    The Request for Declaratory Relief is Not Justiciable ........................... 2

    C.    The Court Does Not Have Personal Jurisdiction Over ISI ..................... 2

BACKGROUND FACTS ....................................................................................... 2

ARGUMENT ...................................................................................................... 3

    A.    Pearl Seas' Petition To Vacate The July 2, 2010 PFA Is Not Justiciable.............. 3

        1.    The Termination Ruling ................................................................ 3

        2.    The Liability Cap Ruling ................................................................ 5

        3.    The United States Coast Guard Ruling ......................................... 6

    B.    The Request For Declaratory Relief Is Not Justiciable ......................... 6

        1.    The Court Cannot Render Advisory Rulings ................................ 7

        2.    The Court Cannot Grant Affirmative Relief ................................ 8

    C.    ISI Is Not Amenable To This Court's Jurisdiction ............................... 8

CONCLUSION .................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aurand v. Contemporary Mktg., Inc.,*
2005 WL 349995 (D. Conn. Dec. 20, 2005)..........................................................................8

*BP Chemicals Ltd. v. Union Carbide Corp.,*
4 F.3d 975 (2d Cir. 1993).................................................................................................7

*Burger King v. Rudzewicz,*
471 U.S. 462 (1985)................................................................................................2, 9, 10

*CPR (USA) Inc. v. Spray,*
187 F.3d 245 (2d Cir. 1999)............................................................................................7

*Employers' Surplus Lines Ins. Co. v. Global Reinsurance Group,*
2008 WL 337317 (S.D.N.Y. Feb. 6, 2008)......................................................................1

*Fluor Daniel Intercontinental Inc. v. General Electric Co.,*
2007 WL 766290 (S.D.N.Y. Mar. 13, 2007) .............................................................1, 4, 6

*Hall Street Associates, LLC. v. Mattel, Inc.,*
552 U.S. 576 (2008)........................................................................................................8

*Hart Surgical, Inc. v. Ultracision, Inc.,*
244 F.3d 231 (1st Cir. 2001)............................................................................................5

*Lombard Bros., Inc. v. General Asset Mgt. Co.,*
190 Conn. 245 (1983) .....................................................................................................9

*Luff v. Ryan,*
128 F. Supp. 105 (D.D.C. 1955) .....................................................................................6

*Marcoccia v. Post,*
2008 WL 2345872 (Conn. Super. Ct. May 20, 2008)......................................................9

*Maryland Casualty Co. v. Pacific Coal & Oil Co.,*
312 U.S. 270 (1941).........................................................................................................7

*Metallgesellschaft A.G. v. M/V Capstan Constante,*
790 F.2d 280 (2d Cir. 1986)............................................................................................1

*Michaels v. Mariforum Shipping, S.A.,*
624 F.2d 411 (2d Cir. 1980)................................................................................... *passim*

*Mitsubishi Heavy Indus. Ltd. v. Stone & Webster, Inc.,*
2009 WL 3169973 (S.D.N.Y. Sept. 29, 2009)............................................................1, 6

*Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*,
  157 F.3d 174 (2d Cir. 1998)..................................................................4, 5

*Saxis Steamship Co. v. Multifacs Int'l Traders, Inc.*,
  375 F.2d 577 (2d Cir. 1967)...................................................................7

*Tekdoc Servcs., LLC v. 3i-Infotech, Inc.*,
  2009 WL 5064456 (D. Conn. Dec. 15, 2009)..................................2, 8, 9

*Trade & Transport, Inc. v. Natural Petroleum Charterers, Inc.*,
  931 F.2d 191 (2d Cir. 1991)...................................................................1, 4


**STATUTES**

9 U.S.C. § 10(a) ........................................................................................6, 7, 8

9 U.S.C. § 10(a)(4)....................................................................................7

28 U.S.C. § 2201 .......................................................................................2, 6, 7, 8

Conn. Gen. Stat. § 33-929(f)......................................................................8

Respondent Irving Shipbuilding Inc. ("ISI") respectfully submits this Reply Memorandum in support of its cross-motion to dismiss petitioner Pearl Seas Cruises LLC ("Pearl Seas")'s petition to vacate the July 2, 2010 Partial Final Award ("July 2, 2010 PFA"). ISI refers to Pearl Seas' November 4, 2010 memorandum opposing ISI's cross-motion as "Pearl Seas Mem."

## PRELIMINARY STATEMENT

A. *The Petition to Vacate is Not Justiciable.* This Court must grant ISI's cross-motion and dismiss the Petition because the July 2, 2010 PFA decided issues, not liability-and-damages claims. The Second Circuit decisions in *Metallgesellschaft A.G. v. M/V Capstan Constante*, 790 F.2d 280 (2d Cir. 1986) and *Trade & Transport, Inc. v. Natural Petroleum Charterers, Inc.*, 931 F.2d 191 (2d Cir. 1991), do not create broad-brush exceptions to the finality rule established in *Michaels v. Mariforum Shipping, S.A.*, 624 F.2d 411 (2d Cir. 1980), and are not analogous. The path to decision is blazed in *Fluor Daniel Intercontinental Inc. v. General Electric Co.*, 2007 WL 766290, *3-4 (S.D.N.Y. Mar. 13, 2007) (Lynch, J.), ignored by Pearl Seas, where the district court, relying on *Michaels* in the wake of *Metallgesellschaft,* differentiated the determination of liability-and-damages "claims" that a district court can review from the determination of partial claims and "issues" that it cannot review. *See also Employers' Surplus Lines Ins. Co. v. Global Reinsurance Group*, 2008 WL 337317, *5 (S.D.N.Y. Feb. 6, 2008) (Baer, J.) (also recognizing, in accordance with *Michaels* and *Fluor Daniel*, that an award disposes of a "separate and independent" claim only if it resolves both liability and damages in respect of that claim) and *Mitsubishi Heavy Indus. Ltd. v. Stone & Webster, Inc.*, 2009 WL 3169973, *5 (S.D.N.Y. Sept. 29, 2009) (Koeltl, J.) (recognizing that even a liability ruling on a separate and independent claim is not final unless the rights of the parties do not stand in need of further determination). *Fluor Daniel, Employers' Surplus*, and *Mitsubishi* illuminate *Michaels* and preclude Pearl Seas' petition to vacate the "termination," "liability cap," and "United States Coast Guard" ("USCG") rulings in the July 2, 2010 PFA (*see* Pearl Seas Mem. Point V at 26-34)—each ruling the interim determination of an issue on the road to the eventual resolution of the parties' liability-and-damages claims and hence not reviewable.

B.    *The Request for Declaratory Relief is Not Justiciable.*  Pearl Seas cannot cure the jurisdictional infirmity of the Petition under the Federal Arbitration Act ("FAA") by purporting to seek declaratory relief (*see* Pearl Seas Mem. Point IV at 22-26).  No authority permits a district court to use the Declaratory Judgment Act, 28 U.S.C. § 2201 ("DJA"), to override the FAA's jurisdictional limitations and intercede in an ongoing arbitration to tell arbitrators what to do before they issue a final award.  Pearl Seas also cannot ask this Court to grant affirmative relief under the rubric of declaratory relief contrary to the FAA.  Under the FAA and in accordance with *Michaels*, a district court's role is only to review final awards.  It cannot step into an ongoing arbitration.

C.    *The Court Does Not Have Personal Jurisdiction Over ISI.*  Although the Court need not reach this issue, Pearl Seas cannot ground jurisdiction over ISI in Pearl Seas' activities in Connecticut.  "[I]t is the totality of the defendant's [ISI's] conduct and connection with this state that must be considered, on a case by case basis, to determine whether the defendant would reasonably have anticipated being haled into court here."  *Tekdoc Servcs., LLC v. 3i-Infotech, Inc.*, 2009 WL 5064456, *3 (D. Conn. Dec. 15, 2009) (Kravitz, J.) (quoting *Thomason v. Chem Bank*, 234 Conn. 281, 291 (1995)).  Under *Burger King v. Rudzewicz*, 471 U.S. 462 (1985), ISI has no burden to prove that the exercise of jurisdiction would be unreasonable, and the "highly realistic" evaluation of the facts required by *Burger King* (*id.* at 479) shows that the "real object of the business transaction" (*id.*) is a Canadian shipbuilder's construction of a ship in Canada.

### BACKGROUND FACTS

To decide ISI's cross-motion, the Court does not have to wade into the morass of facts misstated by Pearl Seas.  While the history of the parties' dealings is nothing like Pearl Seas suggests, the non-final tenor of the July 2, 2010 PFA, without more, requires the dismissal of the Petition.  Recent developments also underscore the interim nature of the majority arbitrators' rulings in the July 2, 2010 PFA.  On November 9, 2010, the panel issued a further Partial Final Award ("Nov. 9, 2010 PFA"), once again with Messrs. Woods and Sheinbaum in the majority, and Mr. Nourse dissenting.  (A copy of the Nov. 9, 2010 PFA is attached as Exhibit A.)  The Nov. 9, 2010 PFA decides the "deliverability issue" in favor of ISI, *i.e.*, "whether, under the

Contract, Pearl Seas is entitled to reject the Vessel on the basis of its alleged deficiencies" (*see* Nov. 9, 2010 PFA at 2, citing Contract section 7.4.3). The majority has ruled that "Pearl Seas is not entitled to reject the Vessel on the basis of the Vessel's alleged deficiencies." (Nov. 9, 2010 PFA at 6, Conclusion ¶ 1.) That ruling caps 18 months of effort by Pearl Seas to refuse to accept the ship due to conditions that were never sufficient to justify rejection. The issue is no longer whether Pearl Seas *can* reject the ship, but rather *when* Pearl Seas must accept the ship. On November 19, 2010, the majority, with Mr. Nourse dissenting, clarified a phrase in the Nov. 9, 2010 PFA. (The November 19, 2010 email message and dissent are attached Exhibit B.)[1] The majority's message (*see* last paragraph) indicates that the arbitrators await this Court's rulings concerning the Petition before resuming the arbitration. That makes ISI's cross-motion more urgent. The purpose of the finality rule embedded in the FAA is to bar interlocutory applications like the Petition that "interrupt the arbitration proceeding"(*Michaels*, 624 F. 2d at 414).[2] This Court should therefore dismiss the Petition forthwith so that the arbitration can resume forthwith.

ARGUMENT

**A.    Pearl Seas' Petition To Vacate The July 2, 2010 PFA Is Not Justiciable.**

1.    *The Termination Ruling.* Pearl Seas asserted a purported right to terminate the Contract in September, 2009, as a defense to ISI's demand that Pearl Seas take delivery of and pay for the ship, to pre-empt the decision on deliverability recently issued by the panel in the Nov. 9, 2010 PFA. Pearl Seas' tactics failed and Pearl Seas cannot try again in the Petition. The majority's reasoned conclusion in the Dec. 28, 2009 PFA (Wenger Decl. Ex. 17) and again

---

[1]    The majority clarified the meaning of the phrase "the regulatory question" in the last sentence of the first paragraph on page 2 of the Nov. 9, 2010 PFA, in which the majority arbitrators said they had left "the regulatory question to be determined by the Court in the action which has been commenced by Pearl Seas." As the majority has explained in Mr. Woods's November 19, 2010 message (Ex. B), they had in mind only this Court's review of the Petition.

[2]    On November 16, 2010, Pearl Seas filed another action against ISI in the District of Connecticut, Docket No. 10-cv-1801 (CSH), claiming breach-of-contract damages. That complaint does not bear on the justiciability of the Petition and is otherwise barred by the arbitration agreement in Contract section 14.1.1.3.

in the July 2, 2010 PFA that the Contract wording precludes termination, Canadian law precludes rescission, and the Contract wording precludes cancellation on account of delay (*see* July 10, 2010 PFA at 6-13) is not analogous to the narrow "separate and independent" exception in *Metallgesellschaft*, which concerned a final liability-and-damages ruling necessary to enforce a shipowner's immediate right to unpaid freight. The liability-and-damages award in *Metall-gesellschaft* directing the charterer to pay wrongfully withheld freight finally resolved the ship owner's freight claim and was tantamount to a final judgment. Nor is the liability award in *Trade & Transport* analogous. That case does not stand for the proposition that parties can create "finality" simply by agreeing to the discrete determination of potential "issues" that do not resolve liability-and-damages claims. ISI nonetheless did not agree to stand-alone rulings by the arbitrators that Pearl Seas could then appeal *seriatim* to a district court. ISI followed the panel's briefing directions, with the arbitrators determining what issues to decide and when. And the termination ruling is not a final *liability* determination "expressly intended to have immediate collateral effect" (*Trade & Transport*, 931 F. 2d at 195) in related judicial proceedings.

Under the *Fluor Daniel* analysis mandated by *Michaels*, the termination ruling is not the requisite determination of a *liability-and-damages claim*. *See Fluor Daniel*, 2007 WL 766290 at *4. The monetary "claims" in the arbitration are (a) ISI's demand that Pearl Seas pay for the ship and (b) Pearl Seas' demand that ISI pay delay damages including liquidated damages in accordance with Contract requirements. The panel has not yet addressed those claims because it has not addressed the question of what Pearl Seas must pay for the ship or what liquidated damages, if any, ISI might owe Pearl Seas.

What Pearl Seas claims to be a "false distinction" between "issues" and "claims" (Pearl Seas Mem. at 30) is precisely the distinction explained and applied in *Fluor Daniel*, 2007 WL 766290 at *4. Pearl Seas misunderstands the passage it quotes from *Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*, 157 F.3d 174, 176 (2d Cir. 1998). (*See* Pearl Seas Mem. at 30.) When the Court of Appeals said that "an arbitration award, to be final, must resolve all issues submitted to arbitration" (*Rocket Box*, 157 F.3d at 176), it was distinguishing between all issues submitted to arbitration and *other* issues *not* submitted to arbitration. *See id.* at 177 ("We hold

that the principle that an arbitration award is final if it "resolve[s] all issues submitted to arbitration, and determine[s] each issue fully so that no further litigation is necessary to finalize the obligations of the parties," *Conn Tech*, 102 F.3d at 686 (alterations in original), does not require that the arbitration award resolve *every* outstanding issue that might arise in later litigation between the parties. It requires resolution only of "all issues *submitted to arbitration*" (emphasis original)). Thus, in *Rocket Box,* the award was final and therefore reviewable because it resolved *all* six issues that the parties had submitted to the arbitrators, but not a seventh issue concerning patent invalidity that the parties had expressly excluded from arbitration. *See* 157 F.3d at 175, 177. And in *Hart Surgical, Inc. v. Ultracision, Inc.*, 244 F.3d 231, 235 (1st Cir. 2001), not controlling authority, the parties had expressly agreed to bifurcate liability and damages, the parties had presented all liability issues in "a discrete proceeding" for that purpose, and the award decided *all* liability issues. Nothing remotely similar has happened here.

2.  *The Liability Cap Ruling.*  In the so-called "liability cap" ruling (July 2, 2010 PFA, § II at 2-5), the panel majority re-affirmed its Dec. 28, 2009 PFA (Wenger Decl. Ex. 17). The genesis of the Dec. 28, 2009 PFA was Pearl Seas' request for discovery to determine whether ISI had deliberately delayed completing the ship to inflict financial harm on Pearl Seas, to support Pearl Seas' assertion that such evidence would give it a right to terminate the Contract. In the Dec. 28, 2009 PFA, the majority denied Pearl Seas' discovery request because the Contract terms and Canadian law prevent Pearl Seas from terminating the Contract "on the basis of delay or delivery, even if such delay was occasioned by willful and intentional conduct of Irving Shipbuilding" (Wenger Decl. Ex. 17 at 5). In the July 2, 2010 PFA, the majority adhered to its earlier ruling, rejecting each of the five grounds for reconsideration asserted by Pearl Seas, again relying on Contract wording and Canadian law. (*See* July 2, 2010 PFA, § II at 2-5.) The ruling on Pearl Seas' discovery demand in both the Dec. 28, 2009 PFA and July 2, 2010 PFA concerned only one of numerous issues pending before the panel. The July 2, 2010 PFA is, moreover, a "liability cap" ruling only to the extent it holds that Pearl Seas' remedy for delay is the liquidated-damages provisions of Contract sections 4.2.3 and 4.3.3, which impose a

CAN$2,925,000 ceiling on any delay damages. The July 2, 2010 PFA neither awards nor denies Pearl Seas delay damages because the panel has not yet addressed that claim.

3. *The United States Coast Guard Ruling*. It is frivolous to suggest that the majority concluded that the USCG "is not the national maritime authority of the United States." (Pearl Seas Mem. at 32.) In the July 2, 2010 PFA, the majority construed the Contract and concluded that the USCG, never mentioned in the Contract, is not a "'regulatory body' as that term is used in the Contract." (*See* July 2, 2010 PFA, § V at 14-15.) Regardless, the determination of this "discrete *issue*" (Pearl Seas Mem. at 32) is not reviewable because rulings that resolve "issues that bear on future determinations as to claims that still must be made" (*Fluor Daniel*, 2007 WL 766290 at *4), and which do not resolve liability-and-damages claims, are not reviewable under the *Michaels* doctrine. The USCG ruling also has nothing to do with any expressly agreed bifurcation of liability and damages, *see Mitsubishi*, 2009 WL 3169973 at *5, and no "practicality" doctrine (Pearl Seas Mem. at 33) permits a district court to disregard *Michaels* and review an interim determination of an issue that does not finally resolve a liability-and-damages claim.

**B.      The Request For Declaratory Relief Is Not Justiciable.**

Although not relevant to justiciability, the premise of Pearl Seas' request for declaratory relief (Pearl Seas Mem. Point IV, at 22-26)—*i.e.*, the majority arbitrators "exceeded their authority when it (sic) addressed regulatory issues, which are explicitly excluded from arbitration before the Panel under Contract § 14.1.1.2." (*id.* at 23)—is unfounded because the majority expressly noted they were *not* doing so. (*See* July 2, 2010 PFA at 11-12 and n.8.) Regardless, there is no "threshold" arbitrability issue for this Court to address (Pearl Seas Mem. at 22-23) because the arbitrators are mindful of Contract section 14.1.1.2—and have repeatedly said so.

The lack of justiciability under FAA section 10(a) precludes declaratory relief because the DJA, 28 U.S.C. § 2201, does not enlarge the jurisdiction of a district court to permit judicial review not allowed by the FAA. *See, e.g., Luff v. Ryan*, 128 F. Supp. 105, 108-109 (D.D.C. 1955). It is a truism that the "actual controversy" predicate of 28 U.S.C. § 2201 requires "a substantial controversy * * * of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" (*Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273

(1941)). There can be no "sufficient immediacy and reality" (*id.*) to declaratory relief in aid of a petition that is not justiciable under the FAA.

1.    *The Court Cannot Render Advisory Rulings.*  Pearl Seas "seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Panel may not (a) determine any issues relating to Class or regulatory compliance, (b) extend deadlines for Class or regulatory compliance by Irving or (c) relieve Irving of its regulatory obligations." (Pearl Seas Mem. at 23.)  It also asserts that the arbitrators lack power to decide ISI's application for a ruling that Pearl Seas' interference with the regulatory authorities relieves ISI of any obligation to obtain approvals that Pearl Seas has sought to frustrate. (*See* Petition ¶ 57.)  The majority's November 19, 2010 message takes particular note of that assertion. (*See* Mr. Woods's message, Ex. B, ¶ 3.)  Neither the FAA, however, nor the DJA permits a district court to intercede in an ongoing arbitration and issue interim advisory rulings telling arbitrators what they can and cannot do, *before* they have issued a reviewable final award.  The purpose of the *Michaels* finality doctrine is to ensure that district courts *not* concern themselves with how arbitrators conduct arbitration proceedings, unless and until the arbitrators have issued a final award reviewable under 9 U.S.C. § 10(a).  That the Petition is evidently deterring the panel (*see* Mr. Woods's November 19, 2010 message, Ex. B, last paragraph) is a prime example of the interlocutory "interruption of the arbitration proceeding" (*Michaels*, 624 F. 2d at 414) prohibited by the FAA.  The majority earlier recognized its "duty" to decide the interference issue, based on Pearl Seas' actions, *see* July 2, 2010 PFA at 14 n.9, the majority has reaffirmed its authority under the Contract to do so (*see* Mr. Woods's November 19, 2010 message, Ex. B, last paragraph), and the FAA and *Michaels* bar Pearl Seas from asking a court to stop the arbitrators from discharging their perceived duty.

Because "[t]he requirement of actual controversy encompasses concepts such as ripeness, standing, and the prohibition against advisory judicial rulings" (*BP Chemicals Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 977 (2d Cir. 1993)), Pearl Seas cannot rely on the DJA to seek advisory rulings on what the arbitrators can and cannot decide.  If a party alleges that arbitrators have exceeded their powers, the only remedy is for a district court to review the arbitrators' actions in accordance with 9 U.S.C. § 10(a)(4), *after* the arbitrators have issued a final award.  No rule of

law permits a district court to intrude into an arbitration in progress whenever one party alleges that the arbitrators are doing what that party believes they should not do. *See, e.g., CPR (USA) Inc. v. Spray*, 187 F.3d 245, 253 (2d Cir. 1999) (recognizing a district court's limited *post-arbitral* jurisdiction). "[T]he role of the courts is limited to ascertaining whether there exists one of the specific grounds for the vacation of an award, provided in § 10 of the [FAA]." *Saxis Steamship Co. v. Multifacs Int'l Traders, Inc.*, 375 F.2d 577, 581 (2d Cir. 1967).

2.     *The Court Cannot Grant Affirmative Relief.* Equally misguided is Pearl Seas' plea that the Court displace the arbitrators and grant affirmative relief. According to Pearl Seas, it "seeks an order from this Court that addresses two regulatory issues: (a) recognizing the binding rulings from Lloyd's Register and the Marshall Islands that the Vessel does not comply with their respective regulatory requirements (and did not within the relevant contractual time period(s) and (b) ordering the Contract terminated for Irving's failure to obtain Class certification and Flag state approval[.]" (Pearl Seas Mem. 24.) The inaccurate predicate facts aside, the FAA and DJA afford this Court no power to grant interim affirmative relief in respect of an arbitration in progress. The FAA, as noted, affords district courts limited power only to review final awards in accordance with the "egregious" standards in 9 U.S.C. §10(a). *See Hall Street Associates, LLC. v. Mattel, Inc.*, 552 U.S. 576, 586 (2008). Understandably, Pearl Seas cites *no authority* permitting a district court, in a 9 U.S.C. §10(a) action, to exercise discretionary *declaratory-judgment* jurisdiction to overstep an ongoing arbitration and decide matters itself.

**C.     ISI Is Not Amenable To This Court's Personal Jurisdiction.**

Although the Court need not reach the jurisdiction issue, Pearl Seas has not made a *prima facie* showing to support jurisdiction. The dispositive fact of the matter is that the focus of the parties' dealings has been the shipyard in Halifax, not Pearl Seas' offices in Connecticut. There is no material difference between ISI's description of the limited number of meetings in Connecticut (*see* Durrell Decl.) and Pearl Seas' (*see, e.g.*, Robertson Decl.), all ancillary to ISI's ship construction in Halifax. Pearl Seas' actions in Connecticut do not confer jurisdiction over ISI. Although Pearl Seas' execution of the Contract in Connecticut satisfies the first prong of the Connecticut long-arm statute, Conn. Gen. Stat. § 33-929(f), the second prong is relevant to the

due process analysis. As stated in *Tekdoc*, 2009 WL 5064456 at *3, quoting *Aurand v. Contemporary Mktg., Inc.*, 2005 WL 349995, *3 (D. Conn. Dec. 20, 2005), "[w]henever a plaintiff has sought to rely on *its own* performance of the contract in Connecticut to satisfy the long-arm statute, the courts have found jurisdiction only where (1) the contract expressly contemplated or required performance in Connecticut; or (2) the plaintiff had actually performed its obligations in Connecticut and such performance was the most substantial part of the obligations to be performed under the contract" (emphasis original). Here, Pearl Seas' actions in Connecticut were not "the most substantial part of the obligations to be performed under the [C]ontract." (*Id.*) But for the fact that Pearl Seas signed the Contract in Connecticut after ISI signed it in Canada, Pearl Seas could not ground jurisdiction in the long-arm statute. The Court nevertheless cannot exercise jurisdiction over ISI because, on a due process analysis, "the totality of [ISI's] conduct and connection with" Connecticut—the relatively few meetings in Connecticut over the course of three years, while ISI was building the ship in Halifax—is too limited to conclude that ISI "could reasonably have anticipated being haled into court here" (*Tekdoc*, 2009 WL 5064456 at *3), especially when the parties agreed to arbitrate in New York. (*See Burger King*, 471 U.S. at 482.)

It is no use for Pearl Seas to cite instances when ISI advertised in publications such as "Maritime Reporter and Engineering News" and "Marine Log" (*see* Wise Decl.) having global distribution (*id.* Exs. I and J) because promotional activity in international publications not targeted at Connecticut does not constitute the solicitation of business in Connecticut for jurisdictional purposes. *See Marcoccia v. Post*, 2008 WL 2345872, *2 (Conn. Super. Ct. May 20, 2008) (advertising in New York Times Magazine insufficient) and *Lombard Bros., Inc. v. General Asset Mgt. Co.*, 190 Conn. 245, 257 (1983) (advertising in New York Times and Wall Street Journal insufficient). Nor can a marketing vice-president's attendance at the annual meeting of the Connecticut Maritime Shipping Conference in 2009 and 2010 expose ISI to jurisdiction in Connecticut while it was building the ship in Halifax. Such sporadic activity does not constitute the requisite systematic solicitation of business in Connecticut. ISI bears no burden to show that Connecticut jurisdiction would be unreasonable because ISI's sporadic

contacts with Connecticut do not demonstrate that ISI purposefully established the requisite minimum contacts within Connecticut. (*See Burger King*, 471 U.S. at 476-478.)

Pearl Seas cannot plausibly suggest (Pearl Seas Mem. at 16) that ISI stands on the same footing as the Michigan franchisee in *Burger King,* 471 U.S. at 479-480, who was subject to jurisdiction in Florida after reaching out to Burger King, a national franchisor headquartered in Miami, to purchase a long-term 20-year franchise that required "exacting regulation of his business from Burger King's Miami headquarters" (*id.* at 480), with a Florida choice-of-law clause that "reinforced his deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there" (*id.* at 482). Tellingly, Pearl Seas ignores the jurisdictional analysis mandated by *Burger King*, *i.e.*, the "highly realistic approach that recognizes that a contract is ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction" (471 U.S. at 479) (internal quotations omitted). Here, any "highly realistic approach" must recognize that the "future consequences" that are "the real object of the business transaction" (*id.*) are a Canadian shipbuilder's construction in Canada of a ship to be delivered in Canada, in accordance with a contract governed by Canadian law and subject to New York arbitration, with the Canadian shipbuilder providing no services to the ship owner in Connecticut.

## CONCLUSION

ISI respectfully re-urges this Court to dismiss the Petition or, alternatively, transfer the action to the Southern District of New York.

Respectfully submitted,

Of Counsel:

Stanley McDermott III
David Wenger
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, NY 10020-1104
Tel.: (212) 335-4790
Fax: (212) 884-8490
Email: Stanley.mcdermott@dlapiper.com
Email: David.wenger@dlapiper.com

**RESPONDENT
IRVING SHIPBUILDING INC.**

By: /s/Ralph W. Johnson III
    Ralph W. Johnson III
    CT Fed. Bar No. 15277
    **HALLORAN & SAGE LLP**
    One Goodwin Square
    225 Asylum Street
    Hartford, CT 06103
    Tel.: (860) 522-6103
    Fax: (860) 548-0006
    Email: Johnsonr@halloran-sage.com

# EXHIBIT A

IN THE MATTER OF ARBITRATION BETWEEN
------------------------------------------------------------------------x

IRVING SHIPBUILDING INC.,

As Builder,

and

PEARL SEAS CRUISES, LLC,

As Owner.

------------------------------------------------------------------------x

**Panel**

Louis P. Sheinbaum
David A. Nourse
John M. Woods, Chairman

Counsel:

For Claimant Irving Shipbuilding Inc. ("Irving Shipbuilding"):
DLA Piper, LLP USA
Stanley McDermott, III, Esq.
David Wenger, Esq.


For Respondent Pearl Seas Cruises, LLC ("Pearl Seas"):
Carter Ledyard & Milburn LLP
Donald J. Kennedy, Esq.
Christopher Rizzo, Esq.


## PARTIAL FINAL AWARD

### I.    Introduction

This Partial Final Award addresses the "Deliverability Issue" and the question of whether the Vessel's alleged deficiencies are proper grounds for its rejection by Pearl Seas.  The Deliverability Issue was the primary subject of hearings before the Panel on February 8-11, March 1-5, March 26, and April 18-22, 2010 and of post-hearing briefs submitted by the parties on June 28 and July 16, 2010.  In ruling on the issues and disputes herein, the Panel has considered the extensive briefing by the Parties, including the voluminous exhibits thereto, and the testimony of the nineteen witnesses at hearings earlier this year.

Consistent with the directive in Section 14.1.1.2 of the Contract between Pearl Seas and Irving Shipbuilding (the "Contract"), the Panel has not considered issues relating to class or regulatory authority approvals, which the Panel has consistently avoided. Instead, the Panel has considered and here addresses other issues relating to the physical condition of the Vessel, which are within the Panel's scope of authority to decide, leaving the regulatory authority question to be determined by the Court in the action which has been commenced by Pearl Seas.[1]

## II.   The Deliverability Issue

The Deliverability Issue concerns whether, under the Contract, Pearl Seas is entitled to reject the Vessel on the basis of its alleged deficiencies. Section 7.4.3 of the Contract provides:

> In the event that the OWNER rejects the Vessel, the OWNER shall indicate in its notice of rejection in what respect the Vessel, or any part or equipment thereof, does not conform to this Contract, to the extent reasonably determinable at the time. The OWNER shall not refuse to accept the Vessel (i) by reason only of deficiencies that are merely cosmetic or subject to prompt correction or otherwise do not materially interfere with the intended operation and trading of the Vessel, and that the BUILDER has undertaken to correct after delivery or (ii) by reason only of the absence of OWNER Supplied Items that the OWNER has failed to provide when required under this Contract, provided, however, that in case of (i) OWNER shall be under no obligation to accept the Vessel if it does not comply with the requirements of the Classification Society or other regulatory bodies.

(Contract § 7.4.3.)

---

[1] Contrary to the allegations in the dissent to this award, the majority of the Panel is not unmindful of the additional grounds for relief sought by Pearl Seas in the recently filed District of Connecticut Court action. However, these grounds do not deprive the Panel of its contractual obligation to decide the deliverability issues, which Pearl Seas has consistently sought to delay or prevent. Indeed, Pearl Seas raised repeated objections to the Panel's attempts, pursuant to §14.1.1.2 of the Shipbuilding Contract, to refer the regulatory issue of compliance with classification society rules to Lloyd's Register. Even after the Panel acceded to Pearl Seas' requirements (including requesting Lloyd's Register to produce all of its inspection records), Pearl Seas still refused to authorize Lloyd's Register to respond to the Panel's request for information. (See submission of Pearl Seas' counsel dated August 2, 2010, in reply to the Panel's email to the Parties dated July 26, 2010.) Pearl Seas' continued obstruction of the Panel's inquiry was clearly designed to avoid a response from Lloyd's Register that may well have been unfavorable to Pearl Seas.

Pearl Seas has submitted to the Panel an updated list of items that it asserts constitute grounds to reject the Vessel ("PSC Summary of Rejection Items," Owner's Exhibit 349). That list identifies seventy items, but Pearl Seas' post-hearing brief addresses only the seventeen items that it considers to be "[t]he most serious defects." (Owner's Post-Hearing Memorandum of Law, dated June 28, 2010, at 9-16.) The Panel addresses those latter seventeen items, both because they encompass essentially all of the seventy items in the Summary of Rejection Items and because they are, by Pearl Seas' admission, the most serious items. To the extent that Pearl Seas' Summary of Rejection Items covers items not discussed in its post-hearing brief, the Panel finds that those items are indeed not serious.[2]

At the outset, the Panel notes that certain of the rejection items identified by Pearl Seas raise issues of class approval and/or regulatory authority approval, and will not be considered or ruled on by the Panel in this Partial Final Award. Those items are: "Fire boundaries and fire safety" (*id.* at 10-11), "Unresolved regulatory issues (fire-rating of ceilings, stairways)" (*id.* at 13-14), and "Forward Stairways" (*id.* at 15).

The Panel addresses each of the remaining issues as follows:

1.    Noise

The Panel is not in a position to rule on any aspect of Pearl Seas' noise complaint, particularly given that the Panel has been advised that new propellers were ordered and were to be shipped to the Vessel in September. (Irving Shipbuilding's Reply Memorandum on Deliverability, dated July 16, 2010, at 6 n.3.) Because there is a dispute as to whether the new propellers will solve the noise and vibration problems, the Panel will not rule on any aspect of the issue until it is determined whether or not the propellers in fact provide a fix.

Thereafter, the Panel may be asked to determine issues including which Party should pay for the new propellers, but that is an issue not yet presented for determination. If the propellers do not fully fix the problem, the Panel may also be presented with issues concerning the approval of the design of the propellers and

---

[2] Or they constitute contract dispute items, which should be submitted to the Panel as such, not grounds to reject the delivery of the Vessel. For example, the issue of whether the ship should be equipped with one or two lengths of 17-shot chain was addressed by Irving Shipbuilding's counsel in their submission to the Panel of May 22, 2009, in which they argue that the contract is in error. Pearl Seas appears not to have addressed that argument, however. Neither have they highlighted it as a serious deficiency in their discussion of "Rejection Items" (Ex. 349). More importantly, Lloyd's Register has never raised the lack of a second length of anchor chain as a class deficiency item, which tends to support Irving Shipbuilding's arguments.

the responsibility for the design of the ship, as well as whether further mediation of any noise and vibration is within the power of the shipbuilder. The foregoing issues, however, constitute monetary damage issues rather than deliverability issues.

2.  HVAC system (standards)

Recently discovered emails provided by Pearl Seas to the Panel (Owner's Exhibit 302) do not warrant any change in the Panel's prior majority ruling regarding the HVAC system standards, dated February 9, 2009.

3.  HVAC system (condensate drain lines)

The alleged deficiencies with the installation of the HVAC condensate drain lines do not rise to the level of a basis to reject the Vessel. Moreover, Pearl Seas admits that the shipbuilder has "undertaken a retro-fit and replacement of the lines and traps." (Owner's Post-Hearing Memorandum of Law, dated June 28, 2010, at 11.) Pearl Seas further states that "the system must be reinspected and tested" (*id.*), which is indeed what should be done.

4.  Ceiling heights

Pearl Seas has failed to demonstrate that the ceiling heights are too low, or what the ceiling heights should be. Further, Pearl Seas makes no attempt to show that the height of the fan coil units, which protrude marginally below the ceilings, are in violation of any Contract or Specification provision. Additionally, the testimony apparently confirmed that the fan coil units on the AMERICAN SPIRIT, the benchmark vessel, also protrude below the ceiling.

5.  Painting deficiencies

*Prima facie* these are punch list or "snag list" items, and cannot constitute a material defect or failure of a mission critical component.

6.  Shower stalls

There is no evidence that the shower stalls do not work and therefore, like the painting deficiencies, they are not a material defect or failure of a mission critical component. This is an item which may be subject to a claim for price adjustment, but the Panel makes no such determination at this time.

7.  Defects Discovered on the June 18 and 19, 2009 Sea Trials

4

Sea trials are undertaken and intended to identify any equipment that does not function properly. The critical question, therefore, is not whether such trials uncover any malfunctions but rather what happens after any such malfunctions are discovered. None of the few items identified in this section (unexplained alarms, malfunctioning refrigerators, and an untested rudder, for example) formed the basis of any specific complaint in Pearl Seas' post-hearing memorandum, and Pearl Seas has not demonstrated that Irving Shipbuilding did not undertake to correct such deficiencies, or that in fact they were not corrected, let alone that they materially interfere with the intended operation and trading of the Vessel.

8.  Balcony doors

As noted by Pearl Seas, Irving Shipbuilding alleges that Lloyd's Register has approved of the balcony doors, and Pearl Seas does not present any evidence to the contrary. Instead, Pearl Seas complains about the ". . . appearance, function, rust and passenger comfort" of the doors. No reference is made to any violation of any Contract or Specification provision. This is a complaint that relates to the quality of the workmanship and Pearl Seas' wish that the work or component parts had been to a higher standard. However, Pearl Seas cannot reject the Vessel on the basis of its own subjective desire that the fit and finish should have been better. The question is whether the Vessel meets the Contract requirements, not Pearl Seas' expectation.

9.  Door sills

Pearl Seas has failed to demonstrate that the door sills are not in compliance with Specification 3243. To the extent they present SOLAS issues, they constitute items of class approval or regulatory authority approval that the Panel will not consider.

10.  Fit and finish issues (e.g. carpeting)

Pearl Seas has likewise failed to demonstrate that the "fit and finish" issues are not in compliance with Specification 3243. To the extent they present SOLAS issues, they constitute items of class approval or regulatory authority approval that the Panel will not consider. However, for the most part these items are minor and constitute punchlist or "snag" items, not mission critical components.

11.  Deck coverings

As noted in the Panel's Partial Final Award dated July 2, 2010, the issue of deck coverings is a contractual dispute, not a deliverability issue. Irving

Shipbuilding rightly has not installed a deck covering because the dispute must be resolved before any covering can be installed. Pearl Seas should present this issue to the Panel as a dispute as to what the Contract requires, not as a material defect in the construction of the Vessel that permits it to reject delivery.

12.  Inadequate deck drains

The allegedly inadequate deck drains do not constitute a material defect or failure of a mission critical item. There has been no showing that this problem, if there is a problem, cannot be remedied.

13.  Pipe system and lack of insulation

Pearl Seas' conjecture as to whether pipes in service will produce excessive condensation is at best speculative, and to the extent insulation which should have been installed is missing, it is a punch list item. In any event, lack of pipe insulation cannot constitute a material defect or failure of a mission critical component.

14.  Pipe Bends

Pearl Seas has failed to prove that the Vessel's pipe bends constitute a material defect, even if they are contrary to a Contract Specification. Pearl Seas states that the pipe bends will "cause an excess of corrosion of [the] pipes," but this impact is speculative.

## III.  Conclusion

Pursuant to the foregoing, the Panel (by majority) makes the following findings and rulings, which shall constitute a Partial Final Award:

1.  Pearl Seas is not entitled to reject the Vessel on the basis of the Vessel's alleged deficiencies.

2.  The parties may present additional issues with respect to the impact of the Vessel's new propeller on noise and vibration, as set forth above.

3.  Pearl Seas may present claims of price adjustment based on the Vessel's alleged deficiencies.

_____
John M. Woods

_____
Louis P. Sheinbaum

_____
David A. Nourse (dissenting)

Dated:   November 9, 2010
         New York, New York

7

## DISSENT

I respectfully dissent from the Partial Final Award ("PFA") of the majority arbitrators addressing the "Deliverability Issue" and holding that Pearl Seas Cruises, LLC ("Pearl Seas"), as "Owner", is not entitled to reject the passenger cruise vessel ("Vessel") tendered for delivery on May 6, 2009, by Irving Shipbuilding Inc. ("Irving"), as "Builder", under the terms of the parties' contract dated September 21, 2006 ("Contract").

I believe that it is inappropriate for the majority arbitrators to render any award at this time, given that issues relating to alleged misconduct and misbehavior of the arbitrators are presently being considered by the U.S. District Court for the District of Connecticut on a petition filed by Pearl Seas to vacate the Partial Final Award dated July 2, 2010, and to stay further proceedings by the arbitrators.

I also believe that the conclusions of the majority arbitrators in this Partial Final Award on the "Deliverability Issue" are entirely inconsistent with the terms of the Contract and the facts of the case and are in derogation to the arbitrators' duties under the arbitration agreement contained in the Contract.

1) <u>As issues relating to alleged misconduct and misbehavior of the arbitrators are before the Court, it is inappropriate for the majority arbitrators to render any further award at this time.</u>

The Panel was advised by Irving on August 17, 2010, that Pearl Seas had filed a petition to vacate the Partial Final Award dated July 2, 2010, in the U.S. District Court for the District of Connecticut. The petition, a copy of which was provided to the Panel by Irving, sought <u>vacatur</u> of the award on the grounds that the arbitrators had exceeded their authority by "investigating and deciding issues relating to vessel classification, flag state and regulatory issues" which were outside the scope of the arbitration agreement, had committed misconduct and misbehavior by, among other things, "improperly extending the deadline for delivery of the ship and improperly holding the issue of contract termination in abeyance" and had "manifestly disregarded the law in rulings that severely and irrationally limit Pearl Seas' remedies under the Contract". (Petition, page 2).

Notwithstanding the filing of the petition, Irving has urged the Panel to proceed respecting the "Deliverability Issue". On the other hand, Pearl Seas has requested that the Panel put the case on "hold" until the Court has determined the issues raised by the petition.

The Panel has been advised that the Court has issued a Scheduling Order dated October 6, 2010, relating to Irving's motion to dismiss the petition. Pursuant to this Order, all submissions are to be made by November 15, 2010.

The majority arbitrators, responding to Irving's request to move forward, have decided to consider issues relating to "Deliverability" which are not "issues relating to class or regulatory approvals", "leaving the regulatory authority question to be determined by the Court in the action which has been commenced by Pearl Seas". (PFA, page 2).

I respectfully submit that the majority arbitrators, in deciding to go forward, have read the petition too narrowly. Certainly Pearl Seas has raised an issue as to whether the majority arbitrators exceeded their authority under the terms of the arbitration agreement by disregarding the absence of any Classification Certificates, flag state and regulatory approvals relating to the Vessel and investigating whether, notwithstanding the lack of these usual and customary indicia of compliance with Class Rules, the Vessel has been built in compliance with Class rules. (Petition, paragraphs 41-45). However, the petition also raises issues relating to the majority arbitrators' open-ended extension of Irving's cure period (Id., paragraphs 46-49), their refusal to address the issue of termination for Irving's failure to obtain Classification Certificates, flag state and regulatory approvals respecting the Vessel (Id., paragraphs 50-62) and their manifest disregard of the law respecting the unenforceability of waivers respecting willful or intentional action (Id., paragraphs 95-103). Indeed, Pearl Seas asserts that the "Panel's misconduct and misbehavior...amounts to a denial of fundamental fairness in the proceeding, and renders the resulting arbitral decision biased, irrational or arbitrary" (Id., paragraph 93) and it seeks a stay of further arbitration proceedings by the Panel as presently constituted and a direction that the parties appoint new arbitrators. (Id., prayer, paragraphs 3 and 4).

Given that the arbitrators derive their authority from the parties' arbitration agreement, I strongly believe that they should not proceed when issues relating to breach of that agreement and their past conduct as arbitrators have been brought before the Court. The arbitration agreement does not give the arbitrators the power to decide their own jurisdiction or to determine the propriety of their own conduct. Under the governing law, that power resides solely with the Court. While I do not doubt the good intentions of the majority arbitrators in wanting to go forward, I believe it is improper to do so when issues of arbitral misconduct remain unresolved.

There is no reason to believe that the issues raised by Pearl Seas' petition will not be resolved within a reasonable time by the Court. Indeed, papers relating to Irving's motion to dismiss the petition are to be submitted by November 15, 2010. There is no reason to believe that Irving would be prejudiced by any delay resulting from the Panel's deferring any decision until the Court has ruled on the petition, given that Irving has placed the Vessel in lay-up in Shelburne, which is considered safer than Halifax in the winter months. In these circumstances, I believe that no further actions should be taken in the arbitration until the Court has had the chance to "clear the air" by considering the issues raised by the petition and resolving the serious charges made by Pearl Seas.

2) Pearl Seas was and is entitled to reject the Vessel under Section 7.4.3 of the Contract because of numerous deficiencies which materially interfer with the intended operation and trading of the Vessel and which Irving has failed to cure in a timely manner.

   a) The applicable standard for decision

Section 7.4.3 of the Contract gives Pearl Seas the right to reject Irving's tender of delivery of the Vessel following trials if "the Vessel, or any part or equipment thereof, does not conform to this Contract". The limitation on this right is stated, in pertinent part, as follows:

> "The OWNER shall not refuse to accept the Vessel (i) by reason only of deficiencies that are merely cosmetic or subject to prompt correction or otherwise do not materially interfere with the intended operation and trading of the Vessel, and that the BUILDER has undertaken to correct after delivery...." (emphasis added).[1]

Thus in considering the deficiencies asserted by Pearl Seas as grounds for its rejection of the Vessel we are required to determine, in each case, whether the deficiency:

- was not in conformity with the Contract ;
- materially interfered with the intended operation and trading of the Vessel;
- was not merely cosmetic;
- was not subject to prompt correction;

     and

- was one which Irving has undertaken to correct after delivery.

   b) Pearl Seas' grounds for rejection

Pearl Seas has documented 70 grounds for rejection of the Vessel. These are summarized in Owner's Exhibit 349.

It is true, as noted by the majority arbitrators, that Pearl Seas's post-hearing brief addressed only 17 of these grounds, which it considered "most serious". (PFA at p. 2). Pearl Seas' limitation of its discussion to "most serious" deficiencies was necessary because of the Panel's instructions to the parties on limiting the length of their briefs. Even a cursory review of the other 63 deficiencies shows that they also were quite "serious".

---

[1] There is, of course, another important part of the Contract's definition of Pearl Seas' right to reject the Vessel, which is the proviso that "OWNER shall be under no obligation to accept the Vessel if it does not comply with the requirements of the Classification Society or other regulatory bodies." As noted by the majority arbitrators, that provision is involved in the proceeding before the Court in the District of Connecticut and is not considered by them in this PFA. (PFA, pages 2-3).

In any event, the majority arbitrators conclude, summarily, that "items not discussed in [Pearl Seas'] post-hearing brief are indeed not serious" and, on that basis, are not worthy of any discussion in the PFA. (Id.). I find this very troubling given that these deficiencies have been fully documented by evidence submitted in the arbitration and, on analysis, meet the materiality requirements of Section 7.4.3 as a basis for rejection of the Vessel.

Take, for example, Pearl Seas' rejection item No. 40 relating to anchor chains. (see Owner's Exhibit 349, page 15). Although the Contract's Specification No. 3010 required that Irving furnish and install two anchor chain assemblies, each consisting of 17 shots of chain, Irving furnished and installed only one 17-shot chain and built a chain locker that could only accommodate one such chain. This was clearly not in conformity with the Contract. Further, it requires only a modicum of maritime knowledge to understand the importance of being able to safely anchor a passenger cruise vessel, the necessity of having a second or "backup" anchor chain assembly available for use when shoreside berthing facilities are not available or in case of an engine breakdown or other emergency and how the lack of a second or "backup" anchor chain assembly would materially interfere with the operation and trading of this particular passenger cruise vessel, limiting its trading to areas of the world where tugs or other forms of assistance were always available if needed.[2] Lack of a backup anchor chain and chain locker in which to stow it certainly was not "merely cosmetic"; instead it was a rather fundamental deficiency in the Vessel's safety equipment. Nor was it subject to prompt correction, but rather requires the removal of the existing, undersized chain locker, redesign and structural modification of the forward part of the Vessel in the way of the existing chain locker, work which Irving has not undertaken to perform. Accordingly, in my view, this rejection item No. 40 meets the requirements of Section 7.4.3 as a basis for Pearl Seas' rejection of the Vessel.

Certainly one may assign more weight to some of the 70 rejection items than to others. However, taken together I believe they make a compelling case in support of Pearl Seas' rejection of the Vessel when viewed in terms of the specific criteria provided by Section 7.4.3. I respectfully dissent from the majority arbitrators' conclusion that rejection items which do not meet their subjective, non-contractual, "serious" criteria need not be considered in this PFA respecting the "Deliverability Issue".

   c) Noise and vibration

This arbitration was commenced by Pearl Seas on August 21, 2008, more than 8 months prior to Irving's tender of delivery of the Vessel in May 2009, respecting several alleged breaches of the Contract, including excessive noise and vibration. The excessive noise and vibration conditions existing both before and after the tender of delivery were confirmed by inspectors acting for both parties. These conditions were the subject of testimony from numerous witnesses during the hearings held in February, March and

---

[2] I also believe it is likely that Classification or other regulatory requirements would be violated by a passenger vessel of this size having only one anchor chain assembly.

April of this year. The evidence shows, conclusively, that the measured conditions on the Vessel substantially exceed the maximum noise levels set by the Specifications for the galley, the dining room, 21 staterooms on the Vessel's 2nd and 3rd deck as well as outdoor assembly spaces. This is clearly not in conformity with the Contract or, indeed, with international maritime standards.

The Vessel was ordered by Pearl Seas for the purpose of participating in the coastwise passenger cruise trade which, as Irving acknowledges, has an elderly clientele[3], many of whom may be expected to be "hard of hearing". Common sense instructs us that such cruise passengers seek and expect quiet conditions for conversation and reflection, particularly in staterooms, dining rooms and public spaces. Yet the evidence submitted to us confirms that the conditions on the Vessel will make conversation in the dining room, public spaces and many of the staterooms difficult, if not impossible. In these circumstances there is no doubt that the excessive noise and vibration conditions both materially interfere with the Vessel's intended operations and, indeed, make it unsuitable for its contemplated use as a passenger cruise vessel. Also such conditions are definitely not "merely cosmetic".

Irving has argued that the excessive noise and vibration are found principally when the Vessel is operating at full speed and can be mitigated by proceeding at slower speeds. However, Specification 1570 states specifically that the noise limits "apply to the vessel at full speed underway with all required auxiliary systems operating...." (emphasis added). Further, the expected operation of a cruise vessel involves proceeding at full speed overnight in order to reach destinations at which passengers may disembark in the morning. Accordingly, speed limitations, if required to reduce noise levels, would also materially interfere with the intended operation and trading of the Vessel.

Irving has also argued that the excessive noise and vibration levels result from factors beyond its control, such as the design of the propellers and the location of the dining room over the engine room. However, the Contract, in Specification 1570, quite clearly requires Irving to "design and build the vessel to minimize noise and vibration" and to "design and use additional treatments as required to achieve the indicated limits". See also Specification 5040 ("Machinery and equipment and their resilient mounting devices shall be selected and mounted to minimize vibration in the equipment and throughout the vessel"); Specification 3321 ("The Contractor shall design and install an acoustic insulation system to meet the maximum permissible noise levels detailed in Section 1570".) Further, the Contract, in Specification 5300, required Irving to furnish and install the propellers "for maximum efficiency at the vessel operating condition, specified by the Owner". In the circumstances, Irving's arguments about not being responsible for the excessive noise and vibration conditions are without merit.

Irving reportedly has ordered new propellers for the Vessel in an effort to limit the excessive noise conditions. Irving's counsel advised the Panel in July that new propellers

---

[3] Irving's Memorandum on Deliverability, page 2, describes the Vessel as "a relatively small modestly outfitted ship, with few public areas and amenities, in keeping with the coastwise cruising model suited for Charles Robertson's elderly clientele."

were expected to be shipped from Taiwan in September. However, there is no evidence that new propellers have been received and installed on the Vessel or, if installed, that they have brought the noise conditions within the Contract's limits.

Accordingly, I believe that Pearl Seas is entitled under the terms of the Contract to reject Irving's tender of delivery of the Vessel, made in May 2009, on the ground that the excessive noise and vibration conditions materially interfere with the Vessel's intended operations and trading and Irving has not, despite the passage of more than 17 months, corrected this deficiency. See Section 7.4.3.

However, notwithstanding that the excessive noise and vibration dispute was fully briefed and submitted to the Panel for decision more than 3 months ago, the majority arbitrators have decided that they are "not in a position to rule on any aspect of Pearl Seas' noise complaint". (PFA, page 3). They note that new propellers were supposed to be furnished to the Vessel in September and state that "the Panel will not rule on any aspect of the issue until it is determined whether or not the propellers in fact provide a fix". (Id.).

I respectfully dissent from the majority arbitrators' decision not to rule on this matter. Under the terms of the Contract and the Way Forward Agreement, the Vessel was supposed to be delivered by Irving on or before the end of May 2008. Irving tendered delivery of the Vessel in May 2009, a full year late. Pearl Seas timely rejected this tender and has fully documented the deficiencies justifying its rejection, most of which still have not been corrected. It is now nearly 30 months after the Vessel should have been delivered. There is no justification for the majority arbitrators to ignore or disregard the time limitations for performance which were built into the Contract and, effectively, extend Irving's time to cure deficiencies ad infinitum. To do so makes a mockery of a carefully drafted commercial agreement, turning the requirement for performance by a date certain into performance mañana, and opens the door to charges of evident partiality to Irving by the arbitrators .

In addition, by accepting appointment under the terms of the Contract's arbitration agreement, the arbitrators agreed to "use all commercially reasonable efforts to conclude the hearings within ninety (90) days after the appointment of the third arbitrator". See Section 14.2.1. The arbitration already has been in progress for more than 2 years and yet the majority arbitrators apparently see it continuing well into the future. I respectfully submit further prolongation of the proceedings is entirely unwarranted and that Pearl Seas should be granted the right to terminate the Contract without further delay for Irving's failure to deliver the Vessel in the condition required by the Contract.

### d) HVAC system, ceiling heights etc.

At pages 3-6 of the PFA, the majority arbitrators summarily conclude that Pearl Seas' complaints about the Vessel's HVAC system, ceiling heights, painting deficiencies, shower stalls, defects discovered during sea trials, balcony doors, door sills, fit and finish

items, inadequate deck drains, insulation of piping systems, and pipe bends are not grounds for rejection of the Vessel. Notwithstanding that Pearl Seas has carefully proved the existence of the deficiencies through testimony and exhibits (including many photographic exhibits) and documented how the various deficiencies justify rejection under Section 7.4.3 (i.e. not conforming to the requirements of the Contract, materially interfering with the Vessel's intended operation and trading, etc.), the majority arbitrators are dismissive of the claims, finding that they are either not proved or not material.

Certainly some of the deficiencies would have more impact on the operations and trade of the Vessel than others. However, I am struck by the magnitude of the problems with the construction of the Vessel that have been shown in this case. Irving had never before built a passenger cruise vessel and apparently never quite came to grips with the obligations respecting construction which it had agreed to assume in the Contract. The result was a substantial amount of shoddy construction and many on-board conditions which were dangerous both for the Vessel's crew and its passengers. Individually, some of these construction deficiencies may not have justified rejection of the Vessel. However, I have no doubt that collectively the deficiencies proven by Pearl Seas fully justify its notice of rejection.

Accordingly, for all of the reasons set out above, I respectfully dissent from the decision of the majority arbitrators that Pearl Seas is not entitled to reject the Vessel on the basis of the alleged and proven deficiencies.

David A. Nourse

Dated:  New York, New York
         November 9, 2010

# EXHIBIT B

| From: | Lee, Connie [Connie.Lee@clydeco.us] on behalf of Woods, John [John.Woods@clydeco.us] |
|---|---|
| Sent: | Friday, November 19, 2010 5:22 PM |
| To: | McDermott, Stanley; 'Kennedy, Donald'; Wenger, David; 'Rizzo, Christopher' |
| Cc: | Louis Sheinbaum; dnourse@nb-ny.com; Nagorski, Adam |
| Subject: | ISI v. PSC |

Attachments:     Dissent.pdf



Dissent.pdf (41 KB)

               Gentlemen,

Below please find the Panel majority's November 19th clarification of their November 9, 2010 Partial Final Award issued today by arbitrators Woods and Sheinbaum.  Attached is the dissent from this clarification by arbitrator Nourse.

     In the interest of clarifying the meaning of "the regulatory authority question" in the November 9, 2010 Partial Final Award of the majority of the Panel, the majority advises that the phrase refers to the allegations and/or issues set forth in Pearl Seas' Verified Petition to Vacate of August 11, 2010 (the "Petition") that:

     (1)  the Panel majority "exceeded their authority by investigating and deciding issues relating to vessel classification, flag state and regulatory issues" (Petition, p. 2).  Specifically, Pearl Seas objects to the Panel having requested the Classification Society to advise the Panel whether, according to the Classification Society, the Vessel has been constructed in accordance with the rules of Lloyd's Register, and is in compliance with the rules and regulations of the Classification Society (See, for example, Par. 52 of the Petition);

     (2)  the Panel majority "committed misconduct and misbehavior by ... (ii) conducting its own investigation and hearing evidence on regulatory compliance issues carved out from the arbitration clause..." (Petition, p. 2); and

     (3)  the Panel majority exceeded its authority by entertaining the application of Irving for the Panel to find and rule that Pearl Seas so interfered with IRI to induce IRI not to flag the Vessel as to be in breach of the contract to construct the Vessel, and under Canadian Law Irving is relieved of any further obligation under the contract to obtain IRI/flag approval of the Vessel (See, for example, Par. 57 of the Petition).

     It is these specific allegations and/or issues, as contained in the Petition, that the Panel majority meant to be "the regulatory authority question", and which the Panel majority leaves for the Court to determine (or not determine) in the course of ruling on the Petition, following which the Panel presumably will proceed further to obtain the requested advice from the Classification Society, and proceed to determine the application of Irving with respect to IRI approval, both of which the Panel majority believes the Panel has the authority to obtain and determine, respectively.

Regards,

John M. Woods
Partner
Clyde & Co US LLP
The Chrysler Building
405 Lexington Avenue
16th Floor
New York, New York 10174

Direct Dial: (212) 710-3915

                                   1

Office: (212) 710-3900
Fax: (212) 710-3950
Mobile: (917) 294-4698

This email message and any attachments may contain legally privileged and/or confidential information intended solely for the use of the individual or entity to whom it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, distribution or copying of this message or its attachments is strictly prohibited. If you have received this email message in error, please immediately notify us by telephone, fax or email and delete the message and all attachments thereto. Thank you.

Clyde & Co US LLP is a Delaware limited liability law partnership affiliated with Clyde & Co LLP, a limited liability partnership registered in England and Wales and regulated by the Solicitors Regulation Authority.

## DISSENT

I respectfully dissent from the majority arbitrators' "Clarification" of a portion of their Partial Final Award ("PFA") dated November 9, 2010.

Given that the PFA was clearly intended to be a final determination of the issues it addressed, subject to confirmation by the Court, I do not believe the majority arbitrators have the authority to modify or "clarify" their decision. Arbitrators act with the consent of the parties, as set out in their arbitration agreement. In the present case, the parties' arbitration agreement provides that, except as otherwise provided in the Contract or as unanimously agreed by the three arbitrators, "the arbitration shall be conducted in accordance with the Rules of the Society of Maritime Arbitrators, Inc," Contract, Section 14.2.3. Those Rules provide, in Section 30 (dealing with the scope of the arbitrators' powers respecting their award), that:

> "The Panel shall retain jurisdiction to modify the Award for the <u>sole purpose</u> of correcting obvious clerical and/or arithmetical errors." (emphasis added).

The "Clarification" in question clearly is not authorized by this explicit provision. Further Pearl Seas Cruises, LLC ("Pearl Seas") has advised that it does not consent to the majority arbitrators' "reconsideration" of their decision. (See Carter, Ledyard & Milburn LLC's letter to the Panel dated November 18, 2010.) Nor do I consent to any modification or avoidance of the Rules governing the arbitration.

The rationale supporting the principle that arbitrators, having made their award, are <u>functus officio</u> and without power to change it is that arbitrators, who are not judicial officers, should not "re-examine a final decision because of the potential evil of outside communication and unilateral influence which might affect a new decision". <u>Domke On Commercial Arbitration</u> (3rd ed. 2010) Section 26:1, page 26-1. That rationale is certainly applicable in the present case as the majority arbitrators, in issuing their "Clarification", are clearly acting at the request of Irving Shipbuilding Inc. ("Irving"), made in DLA Piper LLP (US)'s letter to the Panel dated November 15, 2010, and with the apparent goal of assisting Irving in the context of the on-going litigation between the parties in the U.S. District Court for the District of Connecticut.

Further, I believe the "Clarification" is improper because it evidences a clear intention by the majority arbitrators to take jurisdiction of disputes between the parties which are outside of the terms of the parties' arbitration agreement. Section 14.1.1.2 of the Contract, contained within the Article on "Dispute and Arbitration", clearly provides that any dispute concerning the Vessel's compliance or non-compliance with the rules and regulations of the Classification Society or other regulatory body "shall be referred to the Classification Society or other regulatory body, as the case may be, the decision of which shall be final and binding upon the parties hereto". The phrase "[a]ny dispute", in my view, clearly encompasses the disputes relating both to whether the Vessel has been built in accordance with Lloyd's rules and whether Pearl Seas has "interfered" with the Marshall Island's consideration of acceptance of the Vessel because it communicated to the Marshall Islands its concerns about unsafe conditions on the Vessel.

Notwithstanding this clear limitation on the arbitrators' jurisdiction, the majority arbitrators advise, in their "Clarification", that they intend to proceed with their own investigation with Lloyd's as to whether the Vessel has been built in accordance with its rules and to determine Irving's application regarding "interference", stating that these are issues "which the Panel majority believes the Panel has the authority to obtain and determine".

For all of these reasons, I respectfully dissent from the "Clarification" of the majority arbitrators which I believe is invalid as a matter of law and contrary to the terms of the arbitration agreement from which the arbitrators derive their power.

_____
David A. Nourse

Dated: New York, New York
       November 19, 2010

## CERTIFICATION OF SERVICE

I hereby certify that on November 22, 2010, a copy of the foregoing Reply Memorandum was filed electronically and served by mail on any appearing party unable to accept electronic filing. Notice of this filing will be sent by e-mail to all appearing parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

Also, pursuant to the Court' Chambers Practices, a courtesy copy was sent by hand delivery to:

The Honorable Janet Bond Arterton
c/o Chambers
U.S. District Court
  For the District of Connecticut
141 Church Street
New Haven, CT 06510

/s/ Ralph W. Johnson III
Ralph W. Johnson III