UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| Pearl Seas Cruises, LLC,<br>    *Petitioner*,<br><br>    v.<br><br>Irving Shipbuilding Inc,<br>    *Respondent.* | Civil No. 3:10cv1294 (JBA)<br><br><br><br>February 9, 2011 |

RULING ON MOTION TO DISMISS

The parties have been engaged in an arbitration since April 2008, during which the arbitral Panel has issued a series of partial final awards. Pearl Seas Cruises, LLC ("PSC") filed a petition seeking to vacate the July 2, 2010 Partial Final Arbitration Award pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10, and the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"), codified at 9 U.S.C. § 201, *et seq.* Irving Shipbuilding Incorporated ("ISI") moves to dismiss the petition, on grounds that the Court lacks personal jurisdiction over ISI and that PSC's petition is not justiciable as there is no final arbitral award yet. For the following reasons, ISI's motion will be granted, and PSC's petition will be dismissed without prejudice.

I.    Background

PSC is a limited liability company registered in the Marshall Islands, whose members are residents of Connecticut. ISI is a Canadian corporation that operates a shipyard in Halifax, Nova Scotia. PSC was organized in 2006 for the purpose of owning and operating a small passenger vessel to be constructed by ISI at Halifax. On September 20, 2006, the parties entered into a Contract for the construction and sale of the M/V Pearl Mist (the "Vessel"), an overnight passenger cruise ship. The Contract provides that the Vessel would

be delivered to PSC on May 1, 2008, extended to May 29, 2008 by mutual agreement, and the Contract price was $43.5 million. During and after construction of the Vessel, ISI and PSC repeatedly disagreed about the terms of the Contract and each other's performance. They convened an arbitral panel under the Contract's dispute–resolution clause, to which they have submitted their numerous disputes. On July 2, 2010, the arbitration panel issued its third partial final award (the "July 2 PFA"), in which it addressed a subset of issues but explicitly refused to determine issues of regulatory compliance. The Panel has not yet addressed whether either party is entitled to damages and the amount. PSC petitioned to vacate the July 2 PFA, claiming that the Panel exceeded the scope of its authority and manifestly disregarded the law. The following facts bear on whether this Court has personal jurisdiction over ISI and whether the July 2 PFA is currently justiciable under an exception to the arbitration finality doctrine.

A. Negotiation of the Contract

On March 22, 2006, PSC Vice President Anthony Severn attempted to contact ISI's Vice President of Sales and Marketing, Jack Berglund, in Canada to see if ISI might be interested in the construction of passenger a vessel for PSC. (Robertson Aff., Ex. 15 to Mem. Opp'n [Doc. # 35], ¶ 2.) Severn and Charles Robertson, PSC's President, learned that Berglund was not in Canada but was in Stamford, Connecticut, attending the Connecticut Maritime Association's Annual Conference and Trade Show. (*Id.*) That same day, Berglund called Severn and offered to drive to PSC's offices in Guilford, Connecticut with his colleague Donald Kerr to meet with Severn and Robertson to discuss construction of a vessel. (*Id.*) Kerr and Berglund drove to Guilford and made a sales presentation to Robertson and Severn related to possible construction of a cruise ship. (*Id.* ¶ 3.)

ISI and PSC representatives met again in Guilford on May 24–25, 2006 to discuss construction of a vessel in greater detail. On August 21 and September 13–14, 2006, representatives from ISI and PSC met again in Guilford and negotiated a contract for construction of the Vessel (the "Contract"). Among the ISI representatives were Berglund, executive Vice President Kevin Hudson, and sales manager Peter Williams. (*Id.* ¶ 6.) Berglund and Williams brought the Contract to PSC's Guilford office late September 21, 2006; Hudson and J.D. Irving had already signed it on behalf of ISI, and Robertson signed the Contract that evening, witnessed by Timothy Beebe, PSC Vice President. (Beebe Aff., Ex. 2 to Mem. Opp'n, ¶ 2.) At eight further meetings in Guilford, between February 28, 2007 and February 8, 2008, ISI and PSC representatives met to discuss construction difficulties with the Vessel. (*Id.* ¶ 7.) A variety of ISI employees and representatives attended those meetings, including Berglund, Hudson, Williams, and Steven Coleman, a project manager. Robertson also participated from Guilford in "hundreds" of telephone conversations after March 22, 2006 with ISI executives to discuss the Contract and the Vessel's construction. (*Id.* ¶ 13.)

  B. The Contract

The Contract and its Specifications require that the Vessel, "including the machinery, equipment, appliances, and outfittings shall be constructed in accordance with the rules . . . of and under special survey of Lloyd's Register Society," which was the "Classification Society" designated by the parties. (Contract, Ex. 2 to Resp.'s Mot. Dismiss [Doc. # 31–2] at Sec. 1.3.1.) Section 1.5.1 of the Contract requires that ISI construct a Vessel under the rules and regulations of the Marshall Islands, the designated flag state, and obtain all "documentation and national certification of the vessel for its intended service and route."

3

Section 14.1.1.2 provides that "[a]ny dispute concerning the Vessel's compliance or non–compliance with the rules and regulations of the Classification Society or other regulatory body shall be referred to the Classification Society or other regulatory body, as the case may be, the decision of which shall be final and binding upon the parties hereto." Under Section 14.1.1.3, all other disputes "including disputes relating to the validity, interpretation, performance or enforcement of this Contract shall be referred to arbitration by three arbitrators as herein provided," in accordance with the Rules of the Society of Maritime Arbitrators, Incorporated.

        C.      Arbitration Background

Steel fabrication for the Vessel began in March 2007, and during construction, numerous disputes arose between the parties. On April 21, 2008, ISI served its first two arbitration demands, the first requesting that PSC clarify the ship design, and the second responding to a notice of default given by PSC on April 18, 2008. On August 21, 2008, PSC served its arbitration demand including a comprehensive counterclaim incorporating many complaints and seeking remedies including, *inter alia*, a declaratory award that ISI is obligated to construct the Vessel in accordance with requirements of the Contract, Plans, and Specifications, as to the Vessel's HVAC system and noise and vibration; compensatory damages; and "such other or supplementary relief as justice and equity may require." (Ex. 11 to Wenger Aff.) On February 9, 2009, the Panel issued a partial final award finding that ISI did not anticipatorily breach the Contract in its construction of the Vessel's Heating, Ventilating, and Air Conditioning system with various noise and vibration issues. (Ex. 13 to Wenger Aff.)

ISI finished construction of the Vessel in April 2009, conducted dock–and–sea trials, and on May 6, 2009 gave PSC written notice of completion of the trial run. On May 9, 2009, PSC rejected the Vessel, explaining that "the vessel or any part or equipment thereof does not conform to the Contract," outlining defects that are "not merely cosmetic" that "would materially interfere with the intended operation and trading of the Vessel and would affect the efficient use of the vessel for its intended service." (Rejection Letter, Ex. 11 to Pet.) According to ISI, PSC's refusal to accept delivery thereafter became a central issue in the arbitration.

On June 25, 2009, Graham Brown from Lloyd's Register wrote to PSC's Robertson explaining that "at this time Lloyd's register . . . is unable to issue certification due to incomplete inspections, trials, [International Convention for the Safety of Life at Sea] Exemption issues and Flag State certification," yet "[o]n satisfactory completion of the aforementioned items the final acceptance can be given and the appropriate Classification and Statutory certification issued." (Ex. 13 to Pet.) On August 6, 2009, Jack Polerman, the Deputy Commissioner of Maritime Affairs for the Marshall Islands emailed Robertson, informing him that he had reviewed submitted materials, and concluded that "as shown . . . , the condition of this vessel, MS 'Pearl Mist' Hull no 92 of [ISI] is not to a standard acceptable by the Office of the Maritime Administrator of the Republic of the Marshall Islands for registration in the Marshall Islands ship register." (Ex. 18 to Pet.)

On August 28, 2009, PSC sent the Panel its "Preliminary Memorandum in Support of its Application for an Award and its Basis for Rejecting the Vessel," detailing its bases for rejecting the ship. (Ex. 21 to Pet.) On September 23, 2009, PSC requested that the Panel issue an award (i) holding ISI in default of the Contract and therefore terminating the

5

Contract; and (ii) providing an award of liquidated damages for ISI's delay. (Ex. 24 to Pet.) On September 28, 2009, ISI petitioned the Panel for a decision that PSC was obligated to take delivery of the ship, without responding to PSC's application to terminate the Contract.

D.     July 2, 2010 Partial Final Award

On July 2, 2010, the Panel issued its third partial final award. Three decisions in this PFA are the the subject of PSC's petition and motion to vacate. First, the Panel majority rejected PSC's claim that the liquidated–damages cap provided for in the Contract, $2,925,000 (Canadian), is so inadequate as to be unconscionable and is unreasonable if the Vessel is never delivered. (July 2 PFA, Ex. 27 to Resp.'s Mot. at 2.) The Panel explained that the Contract is clear on its face that the liquidated damages, capped at that sum, is "the sole remedy under the Contract for delay," and the Contract does not contemplate payment of liquidated damages beyond the capped sum in the event of non–delivery because under Section 11.3, "[e]ither the vessel is delivered or the Owner may remove it and complete it." (*Id.*)

Second, the Panel determined that alleged non–regulatory deficiencies in the Vessel—including cosmetic or minor construction defects, failure to install certain Contract items, excessive noise and vibration, and failure to install shower stalls—and the delay in delivering the Vessel caused by construction delays and delays necessitated by arbitration did not justify PSC's termination of the Contract under Canadian contract law, which allows for termination only in instances of fundamental breaches of contracts. Additionally, the Panel held that ISI was not in default because none of the defects and deficiencies claimed by PSC "rises to the level of a failure to perform a material requirement of the Contract." (*Id.* at 10.)   In holding that ISI was not in default, the Panel only considered the

non-regulatory defects PSC highlighted and explicitly avoided addressing the Vessel's regulatory compliance or non-compliance:

> The lack of regulatory approvals is also not an issue which the Panel is presently in a position to conclude gives rise to a default entitling Pearl Seas to rescind the Contract. First, and contrary to the repeated arguments of Pearl Seas, the Panel has not found that the Vessel is not in compliance with Lloyd's Register requirements. Indeed, that question is very much in dispute and it is a dispute that the Panel is not empowered to rule on. As the Parties are aware, the Shipbuilding contract specifically provides that the Panel may not rule on the issue of Class or regulatory compliance, as such disputes must be referred to the Classification Society or other relevant regulatory body for decision (Section 14.1.1.2)[.] Accordingly, the Panel has written to Lloyd's Register, seeking clarification on this point. This is the first step in the process of determining whether or not [PSC] may refuse to accept delivery, pursuant to Section 7.4.3 of the Contract. It will be determined as a deliverability issue, however, not as a matter of termination or rescission of the Contract.

(*Id.* at 11–12.)

Finally, the Panel determined that the United States Coast Guard ("USCG") is not a regulatory body for purposes of the Contract, and therefore, ISI is not required to obtain all USCG approvals prior to delivery, including the USCG's Control Verification Exam ("CVE") and Initial Control Verification Exam ("ICVE"). The Panel explained that unlike Lloyd's Register and the Marshall Islands, who are specifically identified in Contract and Specifications as "regulatory bodies," whose approval is required, the USCG is nowhere so identified. Additionally, the Panel noted that not only does the Contract not mention the USCG, but it also is devoid of any reference to the ICVE or any other USCG requirement, and "[s]uch a requirement, if contemplated by the Parties, clearly should have been included in [Contract] Specification 1001 and 1007, which set forth a list of rules and regulations to which the ship was to be built." (*Id.* at 15.) The Panel recognized that the USCG Navigation

7

and Vessel Inspection Circular ("NVIC"), No. 03–08 makes clear that the owner of a ship must be part of the ICVE process, and for the ICVE inspection, the "vessel must be crewed, in order to carry out the Training and Drills tests. . . . To therefore suggest that the USCG requirements could even be satisfied by [ISI] alone is not realistic." (*Id.* at 15.)

### E. PSC's Petition

On August 6, 2010, PSC filed a petition for vacatur of the July 2 PFA in the Southern District of New York, but dismissed it on August 10, 2010 and refiled in this District on August 11, 2010. Count One claims that the Panel majority exceeded its authority in violation of 9 U.S.C. § 10(a)(4), which applies "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made," by seeking clarification from Lloyd's Register on whether it had determined that the Vessel complies with class and regulatory standards and by deciding that the USCG was not a regulatory body under the Contract. (Pet. ¶¶ 76–85.) Based on the same allegations, Count Two seeks vacatur under 9 U.S.C. § 10(a)(3), which applies "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." (*Id.* ¶¶ 89–94.) Count Three challenges the Panel's "manifest disregard of the law," based on its decisions that PSC could not terminate the Contract and that the USCG is not a regulatory body. (*Id.* ¶¶ 95–98.) Count Four claims violations of Article V of the New York Convention because the arbitral procedures were not in accordance with the parties' arbitration agreement. (*Id.* ¶ 106.)

II. ISI's Motion to Dismiss

   A. Personal jurisdiction

ISI moves to dismiss under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. When responding to a motion to dismiss for lack of personal jurisdiction, the plaintiff must establish both that jurisdiction is permitted under the relevant long–arm statute and that jurisdiction is consistent with due process. *Metro. Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). Due process has two components: the defendant must have sufficient "minimum contacts" with the forum, and the exercise of jurisdiction must be fair and reasonable. *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945).

Because the final signature to the Contract was Robertson's in Connecticut, ISI concedes that jurisdiction exists under Connecticut's long–arm statute, under which jurisdiction over a foreign corporation may arise "out of any contract made in [Connecticut] or to be performed in [Connecticut]," Conn. Gen. Stat. § 33-929(f)(1). *See United Tech Corp. v. Am. Home Assurance Co.*, 989 F. Supp. 128, 134 (D. Conn. 1997) ("Under Connecticut law, a contract is deemed to have been made where the last act is done which is necessary to create an effective agreement between the parties."). However, ISI argues that personal jurisdiction in Connecticut does not comport with due process principles because ISI performed the Contract in Canada by building the ship in its Halifax shipyard, with delivery of the ship to take place in Halifax, and no performance on ISI's part required or contemplated in Connecticut.

In determining whether the respondent has "minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice," *Int'l. Shoe*, 326 U.S. at 316, the Court examines whether the totality of

"the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

Where as here, "the claim arises out of, or relates to, the [respondent's] contacts with the forum—the negotiation" of a contract—the plaintiff need only prove "limited" or "specific" jurisdiction, i.e. the defendant's purposeful minimum contacts within the forum, from which it can be concluded that the defendant 'purposefully availed' itself of the privilege of doing business in the forum and could foresee being 'haled into court.'" *United States Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 152 (2d Cir. 2001) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). The Supreme Court recognized that

> a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

*Burger King Corp.*, 471 U.S. at 479 (internal citations omitted).

The record of "the location and character of the contract negotiations, the terms of the contract, and the parties' actual course of dealing," *Remick v. Manfredy*, 239 F.3d 248, 256 (3d Cir. 2001), shows that ISI representatives made their first sales pitch to PSC in Connecticut; contract negotiations took place with ISI representatives in Connecticut on three separate occasions, two of which were multi–day; and ISI representatives traveled to Connecticut eight times to resolve issues of the parties' performance of the Contract. As in

*James Maroney* and *Big Apple Pyrotechnics*,[1] in which the defendants' sales pitches, contract negotiations, and visits to discuss performance of the contract sufficed as minimum contacts, ISI's negotiations and actual course of dealing took place in both Halifax and Connecticut, and ISI directed its activities to PSC, a citizen of Connecticut. Thus, considering the parties' prior negotiations and contemplated future consequences, along with the terms of the contract and their actual course of dealing, the Court concludes that ISI has requisite minimum contacts with Connecticut to satisfy due process requirements and that there is personal jurisdiction over ISI.

B.     Justiciability of PSC's Petition

ISI also argues that the Panel has not yet issued a final arbitral award and that PSC's petition for vacatur is not justiciable at this stage. PSC counters that even if the July 2 PFA is only an interim award, it remains justiciable because the July 2 PFA decisions are "separate and independent" from remaining issues and that the parties agreed that the July 2 PFA would address those issues and not others. The three decisions reached in the July 2 PFA that PSC seeks to vacate are the Panel's determinations that (1) PSC could not terminate the Contract under Canadian law based on the non–regulatory defects with the ship; (2) the

---

[1] In *James Maroney, Inc. v. Flury & Co., Ltd.*, the requisite minimum contacts with Vermont existed where the defendant reached out to the plaintiff in Vermont to create an ongoing joint venture and made many contacts with the plaintiff in Vermont over a period of several months, thus directing its activities to a citizen of Vermont and creating continuing obligations to that citizen. No. 5:09–cv–252–cr, 2010 WL 3322920, *7–*8 (D. Vt. May 28, 2010). In *Big Apple Pyrotechnics & Multimedia, Inc. v. Sparktacular Inc.*, the defendants "purposefully availed themselves of the privilege of doing business in New York by means of travel to the state for contract negotiations and promotional visits," which "made litigation [in New York] reasonably foreseeable." No. 05 Civ. 9994(KMW), 2007 WL 747807, *7 (S.D.N.Y. Mar. 9, 2007).

"liability cap" on liquidated damages in the Contract applies even in cases of non–delivery of the ship; and (3) the USCG is not a regulatory body under the Contract. PSC argues that these decisions demonstrate that the Panel exceeded its authority and made decisions of regulatory compliance, which Contract Section 14.1.1.2 restricts to determinations by the "Classification society or other regulatory body."

Under the FAA "a district court does not have the power to review an interlocutory ruling by an arbitration panel." *Michaels v. Mariform Shipping*, 624 F.2d 411, 414 (2d Cir. 1980). "The language of the Act is unambiguous: it is only after an award has been made by the arbitrators that a party can seek to attack any of the arbitrators' determinations in court, by moving either to vacate the award" under 9 U.S.C. § 10 "or to modify or correct it" under 9 U.S.C. § 11. *Id.* In *Michaels*, because the arbitral panel whose interim award the petitioner sought to vacate decided some aspects of liability but deferred decision on damages, the Second Circuit affirmed dismissal of the petition as non–justiciable, explaining that "[w]here, as here, arbitrators make an interim ruling that does not purport to resolve finally the issues submitted to them, judicial review is unavailable." *Id.* "In order to be 'final," an arbitration award must be intended by the arbitrators to be their complete determination of all claims submitted to them," and "[g]enerally, for a claim to be completely determined, the arbitrators must have decided not only the issue of liability of a party on the claim, but also the issue of damages." *Id.* at 413–14; *see also Rocket Jewelry Box, Inc. v. Noble Gift Packaging, Inc.*, 157 F.3d 174, 176 (2d Cir. 1998) ("[A]n arbitration award, to be final, must resolve all issues submitted to arbitration, and . . . it must resolve them definitely enough so that the rights and obligations of the two parties, *with respect to the issues submitted*, do not stand in need of further adjudication." (emphasis in original)).

However, there are two recognized exceptions to the finality requirement. The first concerns wholly separable claims where an award "finally and conclusively disposed of a separate and independent claim and was subject to neither abatement nor set–off," even where that award did not dispose of all the claims that were submitted to arbitration. *Metallgesellschaft A.G. v. M/V Capitan Constante*, 790 F.2d 280, 283 (2d Cir. 1986). Such a separate and independent claim determination by an arbitrator can be reviewed in federal court. *Id.* In *Metallgesellschaft*, a ship owner sought through arbitration, *inter alia*, payment of freight charges upon delivery, which it claimed the charterer had improperly withheld. The charterer appealed the district court's confirmation of the arbitral award for unpaid freight on the basis that other claims and counterclaims remained outstanding; however, because the claim for freight payment upon delivery was wholly separable from the other claims before the arbitral panel, the partial award was justiciable under the FAA, and confirmation was affirmed. *Id*; *see also Advest, Inc. v. Asseoff*, No. 92 Civ. 2269, 1993 WL 119690, *6 (S.D.N.Y. Apr. 14, 1993) (finding the issue of attorneys' fees alone to be a sufficiently separate claim to allow confirmation of resolved issues). The Second Circuit created the second exception to the finality requirement for explicitly bifurcated arbitration proceedings in *Trade & Transport, Inc. v. Natural Petroleum Charterers Inc.*, where the parties requested that the arbitral panel bifurcate its adjudication of their claims and decide the issue of liability immediately, to be followed by a separate damages award at a later date. 931 F.2d 191, 19 (2d Cir. 1991). District courts within the Second Circuit have only recognized this exception to the arbitration–finality requirement where the parties expressly asked for immediate determinations in bifurcated proceedings. *See, e.g,*, *Employers' Surplus Lines Ins. Co. v. Global Reinsurance Group*, No. 07 Civ. 2521(HB), 2008 WL 337317, *5

(S.D.N.Y. Feb. 6, 2007) (because the parties did not seek immediate determination from the arbitrators, the case was distinguishable from *Trade & Transport*); *c.f. Andrea Doreen, Ltd. v. Building Material Local Union 282*, 250 F. Supp. 2d 107, 112 (E.D.N.Y. 2003) (because the parties agreed to bifurcate liability from remedy, the arbitrator's decision on liability was final and justiciable).

PSC argues that both of these exceptions apply to the July 2 PFA. However, the parties never expressly agreed to bifurcate liability and damages claims for arbitral determination, even though they requested interim determinations on several issues that arose after the arbitral proceedings commenced. As to the *Metallgesellschaft* "separate and independent claims" exception, ISI contends that the decisions on contract termination, the liability–cap, and the USCG are each only "issues," and not entire "claims," and are all segments of the eventual award on the ultimate claim in the arbitration—whether either party is entitled to damages for breach of the Contract. ISI relies on several district court cases in which requests for judicial review of interim arbitral awards were not justiciable where the awards addressed issues that bore on still–pending arbitral claims. For instance, in *Fluor Daniel Intercontinental, Inc. v. General Electric Co.*, the district court distinguished between the part of the award that determined liability *and* damages, which was final and confirmed, and the portion that addressed only *issues* impacting claims that remained pending before the arbitration panel, such as whether there was evidence to justify piercing the corporate veil, which were not final and not subject to judicial confirmation. No. 06 Civ. 3294 GEL, 2007 WL 766290 (S.D.N.Y. Mar. 13, 2007); *see also, e.g.*, *Mitsubishi Heavy Indus. v. Stone & Webster*, No. 08cv509(JGK), 2009 WL 3169973 (S.D.N.Y. Sept. 29. 2009) (a petition to vacate a partial final award was dismissed without prejudice as non–justiciable

because the partial final award holding Mitsubishi responsible for 97.5 days of delay was only a contingent decision on "the issue of Mitsubishi's share of responsibility for the delay and [did] not finally dispose of Stone & Webster's claim"); *Employers' Surplus Lines*, 2008 WL 337317 at *8 (a final award was justiciable only after both liability and damages were decided because the two "were not severable *claims*," and the parties had not agreed to bifurcate these claims (emphasis in original)). In these cases, because the arbitration panels never "finally and conclusively disposed of" claims submitted to them, *see Rocket Jewelry Box*, 157 F.3d at 176, instead making interim decisions on issues impacting those claims, those interim decisions could be neither confirmed nor vacated.

Likewise here, the Panel has not decided the ultimate claims for damages before it, and the July 2 PFA addressed only interim issues, which are intertwined with the claims that remain pending before the Panel. Whether and how the July 2 determinations will impact the arbitrators' final award resolving the parties' claims remains to be seen, after which judicial review will be appropriate with the full horizon in view.

At oral argument, Petitioner urged the Court to consider a third exception to the arbitration–finality requirement, for "gateway" issues, in light of the Supreme Court's vacatur in *Stolt–Nielsen S.A. v. AnimalFeeds International Corp.* of an arbitral award permitting class arbitration before other issues of liability and damages were addressed. 130 S. Ct. 1758 (2010). In that case, the parties "entered into a supplemental agreement" requesting from the arbitration panel a "clause construction award," determining whether the arbitration clause allowed for class arbitration. After the panel concluded that the arbitration clause permitted class arbitration, the panel stayed further proceeding at the parties' request to allow judicial review. In *Stolt–Nielsen*, the Supreme Court had occasion

to consider the ripeness of the petitioner's motion to vacate the clause construction award in responding to the dissent. The majority held that the matter was ripe based on "the fitness of the issues for judicial decision," and "the hardship of withholding judicial consideration" because "[t]he arbitration panel's award means that petitioners must now submit to class determination proceedings before arbitrators who, if petitioners are correct, have no authority to require class arbitration absent the parties' agreement to resolve their disputes on that basis." *Id.* at 1767 n.2 (internal quotations omitted).

The Sixth Circuit in *Dealer Computer Services, Inc. v. Dub Herring Ford*, "counsel[ed] against reading the decision's ripeness teaching more expansively than it deserves," given that the majority's "entire discussion of ripeness is confined to one footnote," addressing the issue "because the dissent raised it," and "[t]he Court had granted certiorari to decide 'whether imposing class arbitration on parties whose arbitration clauses are 'silent' on that issue is consistent with the Federal Arbitration Act" and not to "clarify the law of ripeness." 623 F.3d 348, 357 & n.4 (6th Cir. 2010). The Sixth Circuit reads *Stolt–Nielsen* to stand for the propositions that (1) "an interim arbitration award is subject to judicial review under the FAA, 9 U.S.C. §§ 9 and 10, only if jurisdictional requisites, including ripeness, are otherwise satisfied"; and (2) "the ripeness inquiry necessitates evaluation of the hardship posed to the movant in the event immediate judicial review were to be denied." *Id.*

PSC argued at oral argument that it faces immediate hardship absent judicial review of the July 2 PFA, based on its apparent view that the Panel intends to determine substantive issues of regulatory compliance contractually relegated to "the Classification Society or other

regulatory body"[2] and has failed to conclude the existence of regulatory non–compliance despite PSC's evidentiary submissions. The Panel's references to regulatory–related issues in the July 2 PFA—communicating with Lloyd's Register for clarification of the status of class or regulatory compliance and excluding the USCG as a contractual "regulatory body"—implicate disputes that fall within Section 14.1.1.3, which broadly applies to "[a]ll other disputes including disputes relating to the validity, interpretation, performance or enforcement of this Contract," and are not substantively related to the narrow carve–out in Section 14.1.1.2 for "any dispute concerning the Vessel's compliance or non–compliance with the rules and regulations of the Classification Society or other regulatory body."[3] Further, it is clear that the Panel has not reached any conclusion about the status of the Vessel's compliance with the rules and regulations of Lloyd's Register and the Marshall Islands authority. Thus, PSC does not face any imminent hardship absent judicial review, and *Stolt–Nielsen* does not support judicial review of PSC's interlocutory appeal from the arbitration in process.

---

[2] PSC's concern is not borne out by the July 2 PFA, in which the Panel expressly declined to weigh in on "disputes concerning the Vessel's compliance or non–compliance with the rules and regulations of the Classification Society or other regulatory body," explicitly stating that "[t]he lack of regulatory approvals is also not an issue which the Panel is presently in a position to conclude gives rise to a default entitling Pearl Seas to rescind the Contract" because "that question is very much in dispute and it is a dispute that the Panel is not empowered to rule on."

[3] Broad clauses give rise to "'a presumption of arbitrability'" such that "arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001) (internal citations omitted).

Because there is no final arbitral award, and none of the recognized exceptions apply, the Court concludes that PSC's petition is not justiciable.

C. Declaratory Judgment

PSC seeks "a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Panel may not determine issues of Class or regulatory compliance or . . . extend deadlines for Class or regulatory compliance," (Pet. at 33), which it argues raises a "threshold" issue of arbitrability, to ensure that the Panel does not exceed its authority. Although PSC correctly states that courts are empowered in certain circumstances to resolve disputes about the scope of arbitration clauses through declaratory judgments,[4] "[i]t is settled law that the Declaratory Judgment Act, 28 U.S.C. § 2201 . . . does not enlarge the jurisdiction of the federal courts, . . . and that a declaratory judgment action must therefore have an independent basis for subject matter jurisdiction." *Concerned Citizens of Cohocton Valley, Inc. v. New York State Dep't of Envtl. Conservation*, 127 F.3d 201, 206 (2d Cir. 1997).[5] As there is no justiciable claim before the Court, and in the absence of an independent claim the Court can review at this time, the Court cannot grant declaratory relief.

---

[4] "Quintessential gateway matters," including "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy," raise "question[s] of arbitrability" that are assigned by Section 2 of the FAA "to the courts." *Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772, 2783–82 (June 21, 2010). Under Section 2 of the FAA, courts decide threshold questions of arbitrability "'[u]nless the parties clearly and unmistakably provide otherwise.'" *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944–95 (1995) (quoting *AT&T Tech., Inc. v. Commc'n Workers*, 475 U.S. 643, 649 (1986)).

[5] 28 U.S.C. § 2201 provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

III. Conclusion

Accordingly, Respondent's [Doc. # 29] Motion to Dismiss is GRANTED, and the Petition is DISMISSED.  The Clerk is directed to close this case.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 9th day of February, 2011.